UNITES STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X

MARIA GARGANO

                        Plaintiff

                   -against-

MASSAPEQUA UNION FREE SCHOOL DISTRICT and Dr. RANDALL SOLOMON,

                    Defendants.

-------------------------------------------------------------------------X

Docket No.: 20-cv-04780-GRB-ARL

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

The plaintiff, MARIA GARGANO (henceforth "Plaintiff"), through the undersigned attorney, brings this action against the defendants, MASSAPEQUA UNION FREE SCHOOL DISTRICT ("MUFSD") and Dr. RANDALL SOLOMON ("Dr. Solomon") and respectfully alleges as follows:

PRELIMINARY STATEMENT

1. This is a civil action, seeking monetary and injunctive relief and punitive damages for the Plaintiff MARIA GARGANO, Plaintiff asserts state law claims for tortious acts of fraud and deceit, both common and statutory.

## NATURE OF THE CLAIM AND THE PARTIES

2. Plaintiff seeks recovery for monetary damages for the harm caused to her reputation, livelihood, and career as a stellar elementary school teacher; additionally, for the defamation, discrimination, distress, suffering, mental, emotional, and physical anguish and humiliation, impairment of ability to secure future employment, impairment of earning power and embarrassment inflicted upon her due to the negligence, carelessness, recklessness, and, misfeasance, malfeasance, and negligent acts practices, and/or omissions of the Defendants, particularly in deviating from the acceptable standards of review and investigation in accordance with the State Education Department, the Commissioner of Education, and the Massapequa Federation of Teachers; and negligently, improperly, and unprofessionally failing to expeditiously investigate obviously false, frivolous, retaliatory, unsubstantiated, and delusive allegations erroneously made against the Plaintiff by the Superintendent of Schools; inappropriately placing her on administrative leave and inappropriately making her the subject of extensive, inappropriate, and unnecessary psychiatric examinations conducted by Dr. Randall Solomon where she was inter alia, erroneously deemed unfit to teach in a report submitted to Defendant MUFSD by Solomon under the color of law, namely Section 913, and subjected to a disciplinary proceeding in accordance with Education Law Section 3020-a; and in causing her to be continuously denied employment as a result of having to disclose the fact that she was the subject of a disciplinary proceeding. In sum, even though Plaintiff was found not guilty of all

charges, the stain of the fraud and deceit of Defendants remained in her personnel file.

3. At all times relevant to the actions described herein, Plaintiff was a resident of West Islip, New York, located on Long Island in the County of Suffolk. Plaintiff began her employment with Massapequa Public Schools in 1987 as an Elementary Education Teacher, and from 1987 through 2010 she received satisfactory, if not exemplary, performance evaluations. In June 1990, she received her tenure and the Constitutional protections given under the Teacher Tenure Law Education Law 3020-a.

4. Defendant Massapequa Union Free School District is a public school district located on Long Island, in Nassau County and is a municipal corporation duly organized, authorized and existing under and by the virtue of the laws of the State of New York, with offices located at 4925 Merrick Road, Massapequa, New York 11758.

5. At all times relevant to the actions described herein, Dr. Solomon was a psychiatrist and was an agent for the District at the time of the unlawful practices. Solomon was unlawfully given authority under color of law to control the terms, conditions and privileges of Plaintiff's employment and qualified as agent of the District pursuant to Education Law Section 913. He aided and abetted in the fraud, deceit and discrimination against Plaintiff created by the District and willingly participated in the decision-making process that forms the basis of the pattern and practice described herein to terminate Plaintiff and deny her the rights of her tenured position.

## JURISDICTION AND VENUE

6. The jurisdiction of the Court over this controversy is based upon New York State common law fraud.

7. The unlawful practices alleged below were committed within the County of Nassau, State of New York.

8. The causes of action arose in the State of New York while Plaintiff was employed by the District, which conducts substantial business in the County of Nassau, City of Massapequa, in the State of New York.

9. The Court has jurisdiction over the Plaintiff's claims because the amount in controversy exceeds the jurisdictional amount of $25,000.00.

10. As Nassau County is the county in which the events or omissions giving rise to the claim occurred, venue is proper in Nassau County, New York pursuant to CPLR 503(b).

11. A Notice of Claim was served on the District but has not, to date, been adjusted nor resolved.

## FACTUAL ALLEGATIONS

12. Plaintiff received a B.S. degree in 1983 from Pace University, then a M.S. degree from Dowling College in 1987. She has more than 60 credits beyond her degree.

13. Plaintiff started her teaching career at Brentwood Schools as a permanent sub, after this position was hired by Praise Christian School for two years, and then she got a job at the Massapequa School District (1987).

14. Plaintiff taught General Education to grades k-6 while a teacher there. She is not licensed to teach special education. During the charged year 2010-2011 she taught fourth grade.

15. Dr. Amanda Lowry was in her first year as Principal of McKenna Elementary School in Massapequa in the 2010-2011 school year. She was not familiar with the parents in her building, nor was she sufficiently in control of the parents at that time.

16. April 2010 Plaintiff sustained a concussion and other injuries from a car crash. She remained out of her classroom until January 2011. Plaintiff started seeing a Psychiatrist, Dr. John King.
17. While Plaintiff was recovering, her fourth-grade class had a series of teachers come and go, which angered the parents. Plaintiff was not aware that this class had a series of leave replacement teachers from Kindergarten through grade 3.
18. One student with an Individualized Education Plan (IEP), "GM", was placed in Plaintiff's class during the 2010-2011 school year. Plaintiff believed at the time of her return to her class in January 2011 that GM did not belong in her General Education classroom, as she is not certified as a Special Education teacher, and GM needed a paraprofessional, and an Integrated Co-Teaching classroom, and/or continuous monitoring, which Plaintiff could not give to him.
19. On April 2, 2011, GM's mother "DM" sent a letter to the school district complaining about Plaintiff, saying that she verbally abused GM, did not help him with his work in compliance with his IEP, and placed her son into a 'storage closet' to control his behavior. Other parents received this letter and spread the 'news' throughout the school.
20. On January 6, 2011- only a few days after Plaintiff returned to the classroom – and April 1, 2011, parent meetings were held, at which the discussion centered around how "afraid" students were of Plaintiff's yelling and placing them in the "storage closet". Another rumor was that Plaintiff would call on a student only if they were "crying, bleeding, or dying". Parents were furious that Plaintiff was in the classroom and not the previous teacher, Ms. Primus, who was a leave replacement teacher who allowed the students to

5

do whatever they wanted. The parents had no idea that the allegations against Plaintiff were false.

21. Dr. Lowry was unsure of any of the facts and did not perform an investigation. She decided to believe GM and his friends. No justification for this was known. She told Plaintiff not to speak to the parents, in order to stop the situation from getting worse. Then Plaintiff was told to sit at home until further notice.

22. During the years of 2011, 2012, 2013, at the unsubstantiated demand of the Defendants, Plaintiff was compelled to attend psychological examinations with Dr. Solomon. Dr. Solomon is engaged by many, if not all, of the Nassau County and Suffolk County School Districts, wherein he allegedly engages in similar subversive tactics, such that identical diagnosis of incapability and mental incompetence are rendered against teachers without any corroboration or basis.

23. Dr. Solomon has been described by union presidents as a conduit utilized by the various Districts to purposefully remove teachers who could not otherwise be stripped of their tenure.

24. On April 2, 2011 Lucille Iconis, Superintendent of Schools met with Thomas Caramore, Interim Assistant to the Superintendent for Human Resources and General Administration, and they decided it was necessary to schedule Plaintiff for a mental examination pursuant to Section 913. In May 2011 they informed Plaintiff that she had to see Dr. Solomon.

25. On May 4, 2011 Plaintiff went to the office of Dr. Solomon with her Union Representative. Dr. Solomon told her that he needed his HIPAA form filled out, with

unlimited requests for information Solomon wanted her to give him all information about her life dating back to 1964, when Plaintiff had last visited Good Samaritan Hospital.

26. Plaintiff told Solomon she had to check with her attorney. Solomon proceeded to "examine" Plaintiff by talking to her in a belligerent fashion for 1 ½ hours. Dr. Solomon found her unfit to teach and wrote, "In considering her mental health difficulties which are characterized by the aforementioned deficits in essential areas of judgment, insight, empathic understanding and ability to introspect, the risk that Mrs. Haber will continue to violate appropriate teacher-student boundaries is unacceptably high." He gave her a GAF score of 50 and gave her a diagnosis of Mood Disorder, Anxiety Disorder, Possible Malingering and Narcissistic Personality Features.

27. Dr. Solomon justified his finding of "unfit" by saying that he read documents, and then spoke with [Respondent] for 1 1/2 hours and saw that she had 'very apparent deficits in important areas of psychological processing and perspective' that raised concerns...judgment, insight, ability to engage in a process of introspection in a healthy way, inability to empathically understand the feelings and perspective of others. In addition to that, there was a great deal of inconsistent information that she provided."

28. Dr. Solomon kept repeating "inconsistent", but he never defined what he meant. In fact, and most alarming, Dr. Solomon testified that: "The diagnosis that I was able to make, anxiety disorder, not otherwise specified, and mood disorder, not otherwise specified...the accuracy of this diagnosis was not necessary for me to render the opinion that I did."

29. Defendant Solomon obtained the information after he and Massapequa Superintendent Thomas Caramore ordered Plaintiff to fill out a HIPAA form that was not in compliance with the official government-issued form, and Solomon went

outside of even those limitless requests written therein. Solomon has his own HIPAA form that is not valid as it does not have limits to the period put under scrutiny for the manipulation by Solomon in the 913 exams.

30. Nevertheless, Plaintiff felt pressured to give Dr. Solomon every document requested, from any doctor, so she sent him all the papers he requested on or before June 27, 2011.

31. In a letter to Superintendent Caramore on June 27, 2011 Plaintiff informed him of her compliance with the order of Dr. Solomon, but requested that she be given another psychiatrist other than Dr. Solomon, a doctor who could provide an "unprejudiced" evaluation. She received no response.

32. On or about September 26, 2011, Plaintiff was served with 23 charges of incompetency and misconduct pursuant to Education Law 3020-a.

33. After another visit with Dr, Solomon on July 25, 2012, Plaintiff was given the same diagnosis as previously, except for a lower score on the GAF. This time she was rated 45 (meaning she should be immediately transferred into an institution for the mentally insane).

34. In June of 2013, Plaintiff was interrogated again by Dr. Solomon, who diagnosed her as mentally ill in spite of all evidence to the contrary, and stated in his report that the Plaintiff remains "mentally unfit to continue working as a teacher in the Massapequa School District."

35. Plaintiff was forced to stay home because of these lies about her mental health, and six months later ordered to attend a second mental health exam ("Section 913 examination") with Dr. Solomon, who was now time armed with reports about

Plaintiff's automobile accident which were not relevant to her teaching competence or performance.

36. As a result of Dr. Solomon's erroneous recommendations created after deliberately and maliciously misinterpreting the information in the illegally obtained reports, Plaintiff was deemed unfit to teach and subjected to a disciplinary proceeding in accordance with Education Law Section 3020-a.

37. Education Law section 913 authorizes a board of education to have a medical examination of an employee conducted when questions arise as to the employee's physical or mental health. The statute states that the board of education of any school district "shall be empowered to require any person employed by the board of education … to submit to a medical examination in order to determine the physical or mental capacity of such person to perform his or her duties."

38. The law specifies that the exam must be performed either by the district's director of school health services or by another physician or healthcare provider of the employee's choice. The employee has the right to be accompanied to the exam by a physician or other qualified person of his or her choice.

39. Plaintiff was never told that she could be assessed by a doctor of her choice. In fact, she was forced to see Dr. Solomon not once, but three times, only to be lied about and her character maligned.

40. Plaintiff was initially represented by NYSUT Attorney Steven Friedman, the Union's attorney, but fired him after he advised her to resign or she would be terminated. As Plaintiff knew that she was not guilty of the charges, she refused to admit guilt, consider a fine, suspension, or resignation.

41. Plaintiff hired a private legal team to represent her at the 3020-a arbitration. Thomas Germano, Esq. was appointed arbitrator. On April 3, 2013, a pre-hearing telephone conference was conducted. (There had been 2 previous conferences on Dec. 16, 2011 and Jan. 20,2012, at which time the hearing was held in abeyance pending a possible resolution).

42. On February 27, 2014, Arbitrator Germano found Plaintiff not guilty of all charges in his Opinion and Award: "The Respondent, Maria Haber (Gargano), is found not guilty as charged in all of the Specifications lodged against her in the Charges contained herein, with the exception of Specification 11, for which a non-disciplinary discussion is the appropriate remedy. Ms. Haber is to be restored to her teaching position within the District, made whole for any loss of pay or benefits she may have incurred, with all Charges and Specifications expunged from her record."

43. Plaintiff was sent to the Superintendent's office, now at Birch Lane Elementary School in Massapequa.

44. Throughout March -June 2014, upon Plaintiff was assigned exclusively to solitary training activities. When she sought to meet other teachers to discuss preparation or techniques while on independent study for training in common core Math, she was banned from meeting with other teachers and from entering Birch Lane Elementary School. However, she was later allowed when the teacher providing the training said it would be difficult to bring all the math manipulatives to the room in the Superintendent's office where Plaintiff was assigned to self-study. From April of 2014, until September 29, 2014, Plaintiff's I.D. badge stated that she was merely a monitor and not a certified teacher.

45. It was only in May 2018 that Plaintiff became aware of the fraud and deceit of the Defendants as well as the effects this fraud and deceit had on her life. Plaintiff was asked by a paralegal from her 3020-a legal team to appear as a witness for a Nassau BOCES Speech Pathologist, Debora Becker, who was charged with 3020-a charges after being forced to see Dr. Solomon who gave her a GAF score of 50, without justification. It was also at this time that Plaintiff became aware that the District never gave Dr. Solomon a contract for his work and thus never publicly citing the terms and scope of his work with her.

46. Another fact that shows fraud and deceit is the fact that Dr. Solomon never had to bid for any job with the District that involved a Section 913 assessment.

47. Without a contract or bidding on any job, as well as being paid under the table by the school district, Dr. Solomon was directed to give assessments finding the educator "unfit to work". In fact, Solomon wrote on the top of his notes in the Becker 3020-a, "THEY DON'T WANT HER BACK".

48. The Section 913 law has been weaponized by the use of Dr. Solomon, who is hired to recommend that the school districts fire tenured professionals as "unfit" regardless of whether they are actually unfit. The Defendants know that they are deliberately denying tenured teachers their tenure rights under Education Law 3020-a, namely to have a fair and impartial assessment of their work at a due process hearing, and to have their jobs protected from the whims and fancy of principals and/or superiors, including Superintendents and school boards.

49. The Arbitrator in the 2018 3020-a case of Debra Becker would not hear the testimony of the Plaintiff but did accept into evidence the Plaintiff's Opinion and Award written by Arbitrator Thomas Germano.

50. On May 3, 2018, Ms. Becker, was found not guilty of all charges after the Arbitrator recognized the fraud and deceit of Dr. Solomon. Arbitrator James Brown wrote, "Dr. Solomon's June 3, 2016 written report of his February 2016 evaluation stated various diagnoses of Respondent including "malingering" which he defined as "either a fabrication and/or an exaggeration of symptom in order to consciously and willfully obtain a secondary gain." (Tr. 96). He found that Respondent was malingering because it "would be very unusual for a person to have these kinds of injuries repeatedly." (Tr. 62). In sum, Dr. Solomon's written report of his February 2016 evaluation concludes that Respondent is "not mentally fit" to perform her job duties and that returning her to the classroom constituted an "unacceptably high" risk. (Tr. 101; BOCES Exhibit 1).

    Opinion and Award, pp. 6-7

    "Respondent also argues that BOCES "improperly" retained the services of Dr. Solomon who never "bid for his work." (Respondent Brief at 13). Alleging a violation of a local ordinance, Respondent submits that "public money" was improperly "spent without any budgetary line, no bidding and no accountability" which resulted in two evaluations with "no oversight, guidance or accountability." (Respondent Brief at 15-17)

    Opinion and Award pp. 13-14.

    "Herein, BOCES relies on Dr. Solomon's opinion that Respondent poses a significant risk to her students because she is addicted to prescribed pain medication. Yet, there is no evidence that Respondent's job performance was impaired, and no such evidence was presented to Dr. Solomon. Indeed, Dr. Solomon saw no documentation that Respondent's "work performance was less than acceptable," and he knew of no "instances of her work performance being subpar." (Tr. 177-178)…

12

> … Dr. Solomon also confirmed that Respondent's classroom performance did not trigger her Education Law § 913 evaluation; rather, BOCES expressed concern that Respondent had filed an "excessive" number of workers' compensation claims (Tr. 54) which undoubtedly presented a real challenge for BOCES."

Opinion and Award pp. 15-16

Brown gave the following Award:

> "Respondent, Debra Becker, is not guilty of the Charges and Specifications, and is thus acquitted of the Charges against her."

Opinion and Award, p. 17.

51. Plaintiff retired in May 2018, ready to work on new and different substitute assignments as a teacher. She started sending resumes to schools in New Jersey, and Florida, however the individual schools ask if she had ever been "charged", therefore she could not apply.

52. Despite being exonerated of all charges against her and restored of her teaching position with the District, Plaintiff's harm as a result of the Defendants' actions is continuing, as she has been currently refused employment positions as a result of having to disclose the fact that she was previously charged with disciplinary action and placed on administrative leave, all resulting from being subjected to the 913 psychological examinations by Dr. Solomon wherein he made unsubstantiated findings concerning Plaintiff's capabilities and mental competence to teach which he knew were false.

53. Most recently, on February 21, 2019, and continuing, Plaintiff has applied and been denied employment positions as a teaching assistant and substitute teacher. This inability to secure employment in her field of expertise and education subjects Plaintiff to continuing harm and emotional and physical distress.

13

## FIRST CAUSE OF ACTION
### Fraud

54. Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 53 inclusive, of this Complaint, with the same force and effect as though herein fully set forth

55. Defendants made a misrepresentation of fact in stating that Plaintiff had a GAF score of 45-50, when they knew that this was totally false and blatantly absurd.

56. Defendants' goal was to find Plaintiff unfit to work so that she could be terminated. Defendants wanted Plaintiff to be evaluated by Dr. Solomon and did not tell her she could be assessed by her own doctor because they wanted Plaintiff to rely solely on Dr. Solomon's opinion.

57. At the time that Plaintiff was brought to her 913 with Dr. Solomon she was not aware that there was fraud and deceit in the procedures used to get her into Dr. Solomon's office, and therefore Plaintiff was justified in subjecting herself to the abusive actions toward her by Dr. Solomon, and his report.

58. Defendants are liable for the emotional distress and scarring that they caused Plaintiff for the past six years up to the present day, when Plaintiff cannot get a job teaching in any school. See New York City Transit Auth. V. Morris J. Eisen, P.C., 276 A.D.2d 78, 85, 715 N.Y.S.2d 232, 237 (N.Y. App. Div., 1st Dep't 2000).

59. As a result of Defendants' use of Section 913 to defraud the public in believing the medical examinations ordered by the school board in this matter was lawful and fair, and using Dr. Solomon as a 'Hit Man' and the Law as a weapon of

destruction without justification, Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages, as well as damages for mental anguish and is entitled to damages sustained to date and continuing in as well as punitive damages and costs to be determined at trial.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that the Court enter judgment:

For an Award representing compensatory/emotional damages for Defendants' deliberate and intentional misrepresentation of the Section 913 law and implementation, which was false and known by the Defendants to be false, made for the purpose of inducing the Plaintiff to rely upon it to her harm and injury and withdrawal of the charges filed against the plaintiff pursuant to Education Law 3020-a;

For an award representing compensatory/emotional damages against MUFSU and Dr. Solomon for his false and deceitful assessments of Plaintiff under NYEL § 290 et seq to be determined by a jury;

For reasonable attorney's fees and costs;

For equitable relief; and

For such further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all issues in this action.

Dated: New York, New York
December 7th, 2020

        MASON LAW, PLLC

        /s/ D. Christopher Mason
        D. Christopher Mason
        11 Broadway, Suite 615

New York, NY 10004  
(212) 498-9691  
(212) 498-9692 – Fax  
Attorneys for Plaintiff

## VERIFICATION

I, the undersigned, am an attorney duly admitted to practice law in the Courts of the State of New York, and mindful of the penalties of perjury, affirm the following:

I am a member of the firm of the attorneys of record for the Plaintiff MARIA GARGANO. I have read the annexed VERIFIED COMPLAINT, know the contents thereof, and know the same to be true to my knowledge, except those matters therein which are stated to be alleged upon information and belief, and as to those matters therein not stated upon personal knowledge, are stated upon information and belief based upon documents and information in counsel's file.

The reason I make this Verification instead of the Plaintiff is that the individual Plaintiff does not reside in the county where this law firm maintains its office.

I affirm that the foregoing statements are true under the penalties of perjury.

Dated: New York, New York
December 7th, 2020

                                      MASON LAW, PLLC.

                                      /s/ D. Christopher Mason
                                      D. Christopher Mason
                                      Attorney for Petitioner
                                      11 Broadway – Suite 615
                                      New York, NY 10004
                                      T: 212.498.9691